# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

DENNIS JACOB and　　　　　　　　)
MICHAEL BOLOURI,　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiffs,　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　v.　　　　　　　　　　　　　)　　**C.A. No. 2020-0023-JRS**
　　　　　　　　　　　　　　　　　)
BLOOM ENERGY CORPORATION,　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　Defendant.　　　　　　)

## MEMORANDUM OPINION

Date Submitted: December 7, 2020
Date Decided: February 25, 2021

Blake A. Bennett, Esquire of Cooch and Taylor, P.A., Wilmington, Delaware and Sam Bonderoff, Esquire, James Ostaszewski, Esquire and Matthew Hendrickson, Esquire of Zamansky LLC, New York, New York, Attorneys for Plaintiffs Dennis Jacob and Michael Bolouri.

Kevin G. Abrams, Esquire, John M. Seaman, Esquire and Eliezer Y. Feinstein, Esquire of Abrams & Bayliss LLP, Wilmington, Delaware, Attorneys for Defendant Bloom Energy Corporation.

**SLIGHTS, Vice Chancellor**

On September 17, 2019, forensic analysts at Hindenburg Research published a 54-page report (the "Hindenburg Report"), which concluded that Defendant, Bloom Energy, Inc. ("Bloom" or the "Company"), had misrepresented its financials and the performance of its "green" energy technology.[1] The Hindenburg Report drew on public disclosures, private interviews with industry experts and customers, as well as previously filed lawsuits to make its case that Bloom was misleading its shareholders. It also disclosed that Hindenburg "ha[d] taken a short position in shares of Bloom."[2] The day the Hindenburg Report was published, Bloom's stock price dropped over 21%, closing at $3.31 per share.[3]

In response, on September 18, 2019, Bloom filed a Form 8-K with the Securities and Exchange Commission ("SEC") to refute the claims made in the Hindenburg Report.[4] In February 2020, the Company filed another Form 8-K, where it disclosed that it would revise how the Company accounts for certain of its revenues.[5]

---

[1] Joint Trial Exhibit ("JX") 9. I cite to the docket items as "D.I. __," the Pre-Trial Stip. and Order (D.I. 34) as "PTO __," the Verified Am. Compl. Pursuant to 8 *Del. C.* § 220 to Compel Inspection of Books and Records (D.I. 7) as "Compl. __" and the Section 220 Trial Transcript (D.I. 38) as "Tr. __."

[2] PTO ¶ 4; JX 9 at 2, 51–52.

[3] Compl. ¶ 47.

[4] JX 10.

[5] JX 32.

1

Shareholders apparently were not comforted by either of Bloom's reactive Form 8-K filings. A Bloom shareholder filed a securities action in California (the "*Roberts* Complaint"), in which it was alleged that the questionable accounting practices highlighted by the Hindenburg Report violated Generally Accepted Accounting Principles ("GAAP") and positive law.[6] And Plaintiffs, Dennis Jacob and Michael Bolouri, separately demanded to inspect Bloom's books and records (the "Demands") under Section 220 of the Delaware General Corporation Law ("Section 220") in their capacity as Bloom stockholders for multiple stated purposes, including to investigate potential mismanagement by Bloom's board of directors (the "Board") and officers.[7] Bloom rejected the Demands on the grounds that the Hindenburg Report, as a short report, was inherently unreliable and could not support a credible basis to suspect wrongdoing, and that the scope of documents sought was too broad. This litigation followed.

After conducting trial on a paper record and carefully considering the trial presentations, I deny Bolouri's demand for inspection because he has not met his burden to demonstrate compliance with Section 220's form and manner

---

[6] JX 44 ("*Roberts* Compl.").

[7] Compl. ¶¶ 1–2; PTO ¶¶ 9–18.

requirements.[8]  For reasons explained below, I grant Jacob's demand for inspection but narrow the scope of documents Bloom must produce.

## I. BACKGROUND

The Court presided over a one-day trial on December 7, 2020.[9]  The following facts were proven by a preponderance of the evidence against the backdrop of Section 220's credible basis standard.[10]

### A. The Parties

Plaintiff, Dennis Jacob, is the beneficial owner of Bloom common stock, having continuously held his shares since at least August 2019.[11]  Plaintiff, Michael Bolouri, claims to be a beneficial owner of Bloom common stock, having first acquired his shares one year prior to the time his counsel made his Demand.[12]

---

[8] *See* Tr. at 54:16–21, 107:5–22, 108:2–21.

[9] *See id.* at 1; PTO ¶ 38.

[10] Plaintiffs' evidence is comprised mainly of publicly available information, including newspaper reports.  They also rely (to a limited extent) on interviews with anonymous experts, as cited in the *Roberts* Complaint and Hindenburg Report.  I am mindful that these sources are hearsay and, in some cases, double hearsay.  "Even so, in a Section 220 proceeding, '[h]earsay statements may be considered, provided they are sufficiently reliable.'" *In re Facebook, Inc. Section 220 Litig.*, 2019 WL 2320842, at *2 n.10 (Del. Ch. May 30, 2019) (quoting *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 778 (Del. Ch. 2016)).  Given the minimal weight I have given this evidence in relation to other evidence, I am satisfied it is admissible to support Plaintiffs' credible basis showing.

[11] JX 13 Ex. A.

[12] JX 24 Ex. A at 2.

Defendant, Bloom, is a Delaware corporation operating in the alternative energy space.[13]

## B. Bloom's Business

Bloom was founded in 2001 to offer a reliable and affordable source of energy.[14] The Company manufactures solid-oxide fuel cells that provide customers with an alternative to accessing energy from the electrical grid.[15] Its primary product is the Bloom Energy Server ("Energy Server"), a stationary power generation platform which Bloom claims can deliver reliable, constant power that is both clean and sustainable.[16] Energy Servers use an innovative fuel cell technology to convert standard low-pressure natural gas or biogas into electricity through an electrochemical process without combustion.[17] According to Bloom, the process allows for more efficient energy generation, with reduced operating costs and lower greenhouse gas emissions, as compared to conventional fossil fuels.[18] The Energy

---

[13] PTO ¶ 1.

[14] JX 1 at 134.

[15] Tr. 56:3–6.

[16] *Id.* at 56:6–9.

[17] JX 1 at 150; Tr. 56:10–17.

[18] JX 8 at 10.

Servers are installed on-site to increase electrical reliability and improve the energy grid's resiliency and security.[19]

Bloom generates revenue in three principal ways: (1) selling Energy Servers, (2) installing Energy Servers at a customer's location, and (3) providing maintenance after the Energy Servers have been installed.[20] Customers can access the Company's technology by any of several methods, including purchasing the servers outright, leasing servers from a bank financing party or paying for power without purchasing the servers themselves.[21] Despite these multiple sources of revenue, Bloom has sustained net losses for every period from 2016 to present and depends heavily on government subsidies.[22] Thus, Bloom's shareholders made their investments based not on the Company's current profits, but rather on the promise of its technology and the scalability of its business model as marketed.

## C. The Hindenburg Report

On September 17, 2019, Hindenburg Research published the Hindenburg Report, a 54-page document detailing an investigation that led Hindenburg to conclude, contrary to the Company's public representations, that Bloom's

---

[19] *Id.*

[20] Tr. 56:18–22; JX 1 at 154.

[21] Tr. 56:23–57:3.

[22] *Id.* at 57:8–9, 77:23–78:4; JX 4; JX 5; JX 6; JX 7; JX 8; JX 22; JX 23.

technology was neither profitable nor clean.[23] Specifically, the Hindenburg Report claimed: (1) Bloom's debt had reached "unsustainable levels"; (2) Bloom used deceptive accounting practices to hide servicing liabilities in its Master Servicing Agreements ("MSAs"); (3) Bloom inaccurately estimated the life of its fuel cells; (4) Bloom booked substantial write-downs in the pre-IPO period (where investors could not see the write-downs) while booking new revenue that improved the financials disclosed publicly in the IPO; and (5) Bloom was not a "clean" energy company, placing the government subsidies it had garnered on that account in jeopardy.[24]

To substantiate its claims, the Hindenburg Report drew on news reports, Bloom's securities disclosures, data on the Company's Energy Servers made publicly available on state government websites, prior lawsuits and interviews with Bloom customers and expert witnesses.[25] Appendices were provided to explain Hindenburg's methodology and link its collected data, providing readers with the tools to verify its work by replicating the analysis.[26] There was a customary

---

[23] *See generally* JX 9.

[24] *Id.* at 1–2.

[25] *Id.* at 29–31, 38–42, 46–50.

[26] *Id.* at 46–48.

disclosure in the report that Hindenburg "ha[d] taken a short position in shares of Bloom."[27]

**D. The Hindenburg Report's Fallout**

The day the Hindenburg Report was published, Bloom's stock price dropped over 21%, closing at $3.31 per share.[28]  The next day, September 18, 2019, Bloom responded to the Hindenburg Report by filing a Form 8-K with the SEC.[29]  In the Form 8-K, Bloom stated its position that the Hindenburg Report contained "factual inaccuracies" and "misleading allegations" and explained that it "fe[lt] obligated to correct the record . . . ."[30]

Five months later, on February 12, 2020, Bloom filed a Form 8-K with the SEC in which it disclosed:

> On February 11, 2020, the Audit Committee of the Board of Directors (the "Audit Committee") of Bloom Energy Corporation (the "Company" or "Bloom") determined that its previously issued financial statements as of and for the year ended December 31, 2018, as well as financial statements for the three-month period ended March 31, 2019, the three- and six-month periods ended June 30, 2019 and 2018 and the three- and nine-month periods ended September 30, 2019 and 2018 (collectively, the "Prior Period Financial Statements"),

---

[27] PTO ¶ 4.

[28] Compl. ¶ 47.

[29] JX 10.

[30] *Id.*

should no longer be relied upon due to an error in accounting for the Company's Managed Services Agreements (the "Impacted MSAs").[31]

Though the Hindenburg Report criticized Bloom's accounting for *liabilities* associated with MSAs, the Form 8-K was not responsive to that criticism since it addressed accounting for *revenues* derived from the MSAs.[32]

On April 21, 2020, Bloom stockholders brought a class action in the Northern District of California, styled *Roberts v. Bloom Energy Corp.*, asserting claims of securities fraud against Bloom, along with several of its officers and directors.[33] The *Roberts* Complaint comprises 522 paragraphs and alleges Bloom misled investors by, *inter alia*, (i) "improperly accounting for loss contingencies relating to its Energy Servers"; (ii) "misrepresenting the life cycle of its fuel cells"; (iii) "improperly accounting for revenue"; (iv) "failing to review weaknesses in its internal controls"; and (v) "misrepresenting the efficiency and pollution output of its Energy Servers."[34]

Like the plaintiffs in the *Roberts* action, Plaintiffs here were concerned by the issues raised in the Hindenburg Report and directed demands for inspection of books

---

[31] PTO ¶ 6.

[32] *Id* at ¶¶ 3, 6.; JX 9.

[33] PTO ¶ 7; *Roberts* Compl.

[34] *Roberts* Compl. ¶ 3.

and records to Bloom on September 25, 2020 (Jacob) and November 25, 2020 (Bolouri).[35]  Both Demands stated four purposes for inspection: (i) to investigate potential wrongdoing, mismanagement and breaches of fiduciary duties by management and the Board in connection with the events, circumstances, and transactions described in the Hindenburg Report; (ii) to assess the ability of the Board to impartially consider a demand for action; (iii) to seek an audience with the Board to discuss potential reforms; and (iv) to take appropriate action in the event management and the Board did not properly discharge their duties, including the preparation and filing of a stockholder derivative lawsuit, if appropriate.[36]

For his part, Jacob's Demand identified four categories of documents for inspection dating back to July 2017:

1. Board Materials relating to, concerning or reflecting: (a) Bloom's accounting practices; (b) the Company's servicing costs and liabilities; (c) any discrepancies between the actual and anticipated servicing costs and liabilities; (d) the Company's "clean" energy claims; (e) the Company's $CO_2$ emissions; (f) the meetings of the Board and any of its committees (without limitation); (g) any and all inquiries or investigations of the

---

[35] JX 13 (Jacob's Demand); JX 24 (Bolouri's Demand).

[36] JX 13 (Jacob's Demand); JX 24 (Bolouri's Demand).

9

Company by any federal, state, or local government regulators or law enforcement agencies regarding the Company's accounting practices; and (h) any internal investigations by the Company of any employees or officers for accounting irregularities.

2. Documents reflecting the Company's investigation by any federal, state, or local government regulators or law enforcement agencies for accounting irregularities.

3. Documents reflecting the Company's investigation of any officer or employee for accounting irregularities.

4. Documents reflecting the servicing costs and liabilities that the Company expected to incur.[37]

Bolouri's Demand was nearly identical but did not include Categories 1(d), 1(e), 3 or 4 and sought documents dating back to May 2018.[38] Plaintiffs initiated this Section 220 action after Bloom rejected both Demands.

---

[37] JX 13.

[38] JX 24.

### E. Procedural History

On March 9, 2020, Plaintiffs jointly filed their operative Complaint.[39] The parties submitted Pre-Trial Briefing on November 25, 2020.[40] Trial convened on December 7, 2020, and the matter was submitted for decision that day.[41]

## II. ANALYSIS

A plaintiff seeking to inspect books and records under Section 220 "must establish by a preponderance of the evidence that [he] is a stockholder, has complied with the statutory form and manner requirements for making a demand, and has a proper purpose for conducting the inspection."[42] If each of these requirements are met, the plaintiff must then show "that each category of the books and records requested is essential and sufficient to the stockholder's stated purpose."[43]

Bloom objects to the Demands on three grounds. First, Bloom argues that one of the Plaintiffs—Bolouri—has failed to comply with Section 220's form and manner requirements. Second, Bloom asserts that neither Plaintiff has stated a

---

[39] Compl. at 1.

[40] D.I. 32, 33.

[41] Tr. at 1.

[42] *Pettry v. Gilead Scis., Inc.*, 2020 WL 6870461, at *9 (Del. Ch. Nov. 24, 2020).

[43] *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del. 1996).

11

proper purpose for inspection. Finally, Bloom contends that the scope of the Demands is overly broad. I address each objection in turn.

## A. The Form and Manner Objection

"Delaware courts require strict adherence to the [S]ection 220 inspection demand procedural requirements."[44] Those requirements are stated in Section 220(b), where the General Assembly has directed that a stockholder's demand for inspection must "state [under oath] the person's status as a stockholder, be accompanied by documentary evidence of beneficial ownership of the stock, and state that such documentary evidence is a true and correct copy of what it purports to be."[45] Documentary evidence of ownership should be "at a point proximate to the date of the Demand."[46] As Chancellor Chandler explained in *Smith v. Horizon Lines, Inc.*, "[t]he purpose of § 220 is not served if the shareholder supplies a document that does not actually evidence that she is the beneficial owner of the company's stock on the relevant date."[47]

Contrary to Section 220(b), the Bolouri Demand was not accompanied by satisfactory documentary evidence demonstrating that he was a Bloom stockholder

---

[44] *Cent. Laborers Pension Fund v. News Corp.*, 45 A.3d 139, 145 (Del. 2012).

[45] 8 *Del. C.* § 220(b).

[46] *Amalgamated Bank*, 132 A.3d at 776.

[47] *Smith*, 2009 WL 2913887, at *2 (Del. Ch. Aug. 31, 2009).

at a point proximate to the date of the Demand. Rather, Bolouri attached an E*TRADE account statement purporting to show that he acquired 25 shares of Bloom Class A Common Stock on October 12, 2018, and held those shares through October 31, 2018.[48] This documentation did not allow Bloom to assess whether Bolouri was a stockholder at the time Bolouri's Demand was made—more than a full year later, on November 25, 2019.[49]

Though Bolouri's documentary evidence was accompanied by an affidavit in which he swore the attached documents were "true and correct,"[50] Section 220 requires *both* "'documentary evidence of beneficial ownership of the stock' *and* that the beneficial owner 'state that such documentary evidence is a true and correct copy of what it purports to be.'"[51] As the court in *Smith* aptly observed, "[i]f a sworn statement alone is sufficient, then what purpose would be served by 'documentary evidence of beneficial ownership?'"[52] Indeed, by Section 220(b)'s terms, the affidavit serves only to affirm the truthfulness of what the requisite documentary

---

[48] *See* JX 24.

[49] *Id.*

[50] *Id.*

[51] *Smith*, 2009 WL 2913887, at *2 (quoting 8 *Del. C.* § 220(b)) (emphasis added).

[52] *Id.*

13

evidence of beneficial ownership "*purports to be*."[53] In other words, the affidavit itself is not the evidence of ownership; the affidavit simply verifies that the actual evidence of ownership is true and correct.

Section 220's form and manner requirements strike the appropriate balance between a stockholder's right to inspection and the company's ability to function free from a flood of baseless shareholder demands for documents.[54] Weighed on these scales, the burden placed on the stockholder to provide proper documentary evidence of beneficial ownership of stock at a point proximate to the date of his demand is relatively minimal and it must be fulfilled before the company will be expected to respond. Because Bolouri failed to comply with Section 220's form and manner requirements, the Company was justified in rejecting his demand for inspection.[55]

---

[53] 8 *Del. C.* § 220(b) (emphasis added).

[54] *See Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 122–23 (Del. 2006).

[55] Bolouri's subsequent attempt to cure the deficiency through a letter from his attorney was likewise deficient. *See* JX 29. The letter lacked the required oaths, a power of attorney, disclosure of Bolouri's purported purposes in making the demand or any clear statement of the documents Bolouri sought to inspect. *See Weisman v. W. Pac. Indus., Inc.*, 344 A.2d 267, 267–68 (Del. Ch. 1975) (holding that an attorney letter following rejection of the original demand did not independently meet the statutory requirements and would "not be considered . . . in testing the sufficiency of" the original demand).

## B. The Proper Purpose Objection to the Jacob Demand

Bloom does not dispute that Jacob's Demand complied with the statutory form and manner requirements.[56] Instead, Bloom maintains that Jacob's stated purpose of investigating wrongdoing, while proper on its face, is not actually proper because Jacob has failed to carry his burden of presenting a credible basis to suspect wrongdoing.

"[C]redible basis" is the "lowest burden of proof known in our law; it requires merely that the plaintiff put forward some evidence of wrongdoing."[57] In other words, "a stockholder is not required to prove that wrongdoing occurred, only that there is possible mismanagement that would warrant further investigation."[58] The stockholder may carry its burden of proof through the presentation of "documents, logic, testimony or otherwise,"[59] and may point to "on-going lawsuits, investigations, circumstantial evidence, and even hearsay statements evincing possible wrongdoing."[60]

---

[56] *See* Def.'s Pre-Trial Br. (D.I. 32) at 29.

[57] *Kosinski v. GGP Inc.*, 214 A.3d 944, 953 n.77 (Del. Ch. 2019) (internal quotations and citation omitted).

[58] *AmerisourceBergen Corp. v. Lebanon Cty. Emps.' Ret. Fund*, 243 A.3d 417, 432 (Del. 2020) ("*AmerisourceBergen II*") (internal quotations and citations omitted).

[59] *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 568 (Del. 1997).

[60] *Pettry*, 2020 WL 6870461, at *11.

According to Bloom, Jacob has failed to meet his credible basis burden for two reasons. First, he has relied almost entirely upon incompetent evidence—namely the Hindenburg Report. Second, he has failed to account for the fact that the Company thoroughly rebutted the Hindenburg Report's allegations in its responsive Form 8-K filings. For reasons explained below, I disagree on both fronts.

Bloom's characterization of the state of our law regarding the weight to be given to so-called "short reports" when assessing the strength of a stockholder's credible basis showing is exaggerated. It is true, as Bloom points out, that this Court has observed that those who write short reports, like the Hindenburg Report, have incentives to spin financial analyses to suit their own investment strategies.[61] But such observations cannot and should not be construed as a declaration that all short reports, and all content within a short report, carry no probative weight as the court assesses the quantum of evidence supporting a stockholder's stated purpose for inspection. Here, by Bloom's own admission, the Hindenburg Report relies primarily on publicly available and vetted information, along with litigation filings and expert testimony. While there may well be bases to undermine that evidence,

---

[61] *See, e.g.*, *Haque v. Tesla Motors, Inc.*, 2017 WL 448594, at *11 (Del. Ch. Feb. 2, 2017) (finding that opinions expressed in a short report based on skewed analyses of financial data had limited evidentiary potency).

should it see the light of plenary litigation, it is, on this record, "'some evidence' of . . . wrongdoing."[62]

Bloom's argument that its September 18, 2019, Form 8-K and press release (JX 10) fully discredited the Hindenburg Report reflects an improper attempt to "draw the court into adjudicating merits defenses to potential underlying claims in order to defeat [an] otherwise properly supported Section 220 demand[]."[63]  To be clear, "a Section 220 proceeding does not warrant a trial on the merits of underlying claims."[64]

In this case, Jacob's credible basis showing rests on firm evidentiary ground. First and most fundamentally, there is some evidence suggesting Bloom misleadingly overestimated the lifetime of its products and underestimated its liabilities for servicing those products through certain accounting practices, purportedly masking $2.2 billion of servicing liabilities from its stockholders and

[62] *Kosinski*, 214 A.3d at 953; *see also Paul v. China MediaExpress Hldgs., Inc.*, 2012 WL 28818, at *5 (Del. Ch. Jan. 5, 2012) (noting that short seller reports will be given more weight where "the events that occurred after the publication of the challenged reports . . . reinforce[d] the shortsellers' claims").

[63] *Lavin v. West Corp.*, 2017 WL 6728702, at *1 (Del. Ch. Dec. 29, 2017); *see also AmerisourceBergen II*, 243 A.3d at 437 (observing, "the interjection of merits-based defenses—defenses that turn on the quality of the wrongdoing to be investigated— interferes with [the 'summary' and expedited] process" of Section 220 litigation).

[64] *Barnes v. Sprouts Farmers Mkt.*, 2018 WL 3471351, at *5 (Del. Ch. Jul. 18, 2018).

the market.[65] Public data on Bloom's projects, sourced from various state governments' utility records and made available through state government websites, suggest Bloom understated in public disclosures the rate at which its fuel cells degrade.[66] The information obtained was corroborated by interviews with business clients such as Home Depot, the testimony of two experts in fuel cells (one with 14 years of experience and the other with 19 years of experience and a Ph.D. in mechanical engineering), as well as a fuel cell technology graduate professor.[67] Though Hindenburg's decision not to identify the experts by name detracts from the weight to be given this evidence, the volume, expertise and tenor of the testimony still register on the undeniably sensitive credible basis scale.

As for the accounting, Bloom was in the practice of providing customers with generous guarantees for servicing its equipment for the life of the contract under an MSA.[68] While these relationships typically lasted up to 25 years, Bloom would report its servicing liabilities for only one year by giving customers the "option" to renew the MSA on an annual basis.[69] Though Bloom points out the Hindenburg

---

[65] JX 9 at 14, 38–42, 46–48.

[66] *Id.* at 46–48.

[67] *Id.* at 14, 38–42.

[68] *See* JX 6 at 90–91.

[69] *See id.* at 14, 39, 90–91.

18

Report leaves open whether either of these practices violated GAAP,[70] the *Roberts* Complaint closes that circle, for Section 220 purposes, by connecting those practices to violations of positive law. Specifically, the *Roberts* Complaint explains how the servicing work related to MSAs was required to be disclosed differently under Section 11 of the Securities Act, not only because this information was material (and therefore deserving of disclosure in its own right) but also because the liabilities were reasonably estimable and, as such, were required to be disclosed under both Item 303 of Regulation S-K and GAAP.[71] By Bloom's own admission in its public disclosures, "virtually no customers have elected to cancel their maintenance agreements."[72] It follows syllogistically, therefore, that Bloom's maintenance agreements are reasonably estimable by virtue of the Company's high customer retention rates and therefore, at least arguably, should be disclosed differently.

---

[70] *See Beatrice Corwin Living Irrevocable Tr. v. Pfizer, Inc.*, 2016 WL 4548101, at *1, *4–7 (Del. Ch. Aug. 31, 2016) *as revised* (Sept. 1, 2016) (rejecting a stockholder's demand that attempted to establish credible basis through evidence that the company failed to comply with GAAP after the stockholder failed to connect the alleged noncompliance with the board's oversight, and the plaintiff's only stated purpose was to pursue a *Caremark* claim).

[71] *Roberts* Compl. ¶¶ 65–73.

[72] JX 9 at 9 (quoting page 123 of Bloom's IPO Prospectus); *see also* JX 6 (Bloom's statement in its 10-K that "[h]istorically, our customers have almost always exercised their option to renew . . . .").

While these are, of course, only allegations, this court has made clear that "[o]ngoing investigations and lawsuits can provide the necessary evidentiary basis to suspect wrongdoing or mismanagement warranting further investigation."[73] And again, the low credible basis threshold is met where wrongdoing is merely *possible*—it need not be proven.

Even if the Court were to entertain Bloom's merits-based defense, Jacob correctly observes that the Company's Form 8-K filings actually may support, rather than defeat, an inference of wrongdoing. Specifically, Jacob argues that Bloom's reactive filing of a second Form 8-K shortly after the Hindenburg Report was published, in which it disclosed "an error in accounting for the Company's [MSAs]," suggests the Company knew it had to get out in front of the impact of the Hindenburg Report as best it could.[74] Though both parties agree the revenue restatement did not relate directly to the servicing liability-oriented allegations in the Hindenburg Report, it nonetheless provides some credence to Jacob's concern regarding the robustness of Bloom's independent controls on their financial reporting. Bloom's contrary contention—that a restatement signals an energized Audit Committee—is, without more context, debatable given that the restatement came so shortly after the

---

[73] *Lebanon Cty. Emps.' Ret. Fund v. AmerisourceBergen Corp.*, 2020 WL 132752, at *9 (Del. Ch. Jan. 13, 2020) ("*AmerisourceBergen I*"), *aff'd*, 243 A.3d 417 (Del. 2020).

[74] PTO ¶ 6. As noted, the accounting error resulted in a write-down of $180 million in revenue. *See* JX 32.

Hindenburg Report and appears, at least on this record, to have been prompted by it.[75]

As a final observation on Bloom's merits defense, I note the Hindenburg Report cited public information evidencing that Bloom issued misleading representations regarding its technology's environmental hallmarks. Specifically, the report cites data tracked by governments "collected from hundreds of Bloom projects" to show the Company's projects "generate more CO2 than the electric grid in key states they operate in and produce CO2 levels comparable to modern natural gas power plants."[76] Bloom's government subsidies, which Bloom admits are foundational to its commercial viability, are contingent on Bloom's status as a "green" energy alternative.[77]

Bloom responds by arguing the Demands, Jacob's Complaint and subsequent briefing never identify any misstatements related to Bloom's "green" company status, never identify any specific actions that were taken to reduce or eliminate Bloom's subsidies, and never explain how a decision to discontinue some or all of

---

[75] *Compare* JX 9 (the Hindenburg Report, published September 17, 2019), *with* JX 32 (the Form 8-K restatement, published February 12, 2020).

[76] JX 9 at 4.

[77] Tr. 77:23–78:4 (Bloom's admission that "[i]t's . . . true that the company relied on subsidies"); *see also* JX 9 at 5–6, 21–34, 49–50 (linking to articles documenting jurisdictions' reduction or revocation of Bloom's subsidies).

Bloom's government subsidies would be evidence of wrongful conduct. Here again, Bloom winks at the evidentiary record. The *Roberts* Complaint highlights an independent study conducted by the University of Delaware published in 2019 showing that Bloom overstates the efficiency of its fuel cells by 20% in public disclosures.[78] It also documents how a group of Delaware Senators relied upon Bloom's apparently misleading public data to suggest a "substantial fine (e.g., $100,000) for every day that CO2 emissions from Bloom fuel cells exceeds 700 pounds per MWH."[79] The perceived state of Bloom's emissions prompted Delaware State Senator David Lawson to declare the following with respect to Bloom: "I think we were sold a bill of goods."[80]

In a last gasp, Bloom contends that Jacob must, but has not, demonstrated that Bloom's officers and directors were specifically complicit in or aware of the underlying wrongdoing. But our Supreme Court in *AmerisourceBergen II* recently "dispel[led] the notion that a stockholder who demonstrates a credible basis from which the court can infer wrongdoing or mismanagement must demonstrate that the wrongdoing or mismanagement is actionable."[81] Accordingly, at this stage, to earn

---

[78] *Roberts* Compl. ¶ 98.

[79] *Roberts* Compl. ¶ 102 (quoting directly from the Delaware Senators' letter).

[80] JX 9 at 31.

[81] *AmerisourceBergen II*, 243 A.3d at 431.

his inspection rights, Jacob need not attempt to connect Bloom's possible wrongdoing directly to individual members of the Board or Company officers.[82]

\* \* \* \* \*

To reiterate, Jacob's burden to demonstrate a proper purpose did not present a Herculean task; instead, it presented the lowest burden of proof recognized in our law. Jacob has carried that burden with ease.[83]

## C. The Scope Objection

As part of his *prima facie* burden, a Section 220 plaintiff must prove "that each category of the books and records requested is essential and sufficient to [his] stated purpose."[84] "[W]here a § 220 claim is based on alleged corporate wrongdoing, . . . the stockholder should be given enough information to effectively address the problem, either through derivative litigation or through direct contact with the corporation's directors and/or stockholders."[85]

---

[82] *See Seinfeld*, 909 A.2d at 123.

[83] *See Pettry*, 2020 WL 6870461, at \*13–14.

[84] *Thomas & Betts*, 681 A.2d at 1035; *see also Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 115 (Del. 2002) (holding that a plaintiff should receive "access to all of the documents in the corporation's possession, custody or control, that are necessary to satisfy [the plaintiff's] proper purpose"); *KT4 P'rs LLC v. Palantir Techs. Inc.*, 203 A.3d 738, 752 (Del. 2019) (observing that, under Section 220, the stockholder is entitled to inspect what is "essential" but not what is beyond "sufficient").

[85] *Saito*, 806 A.2d at 115.

Jacob seeks four categories of documents for the period starting July 1, 2017, through the date of the Demands. Bloom objects that each individual category is too broad. But first, it asserts two blanket objections that apply equally across all categories.

First, Bloom asserts that Bolouri's Demand is narrower than Jacob's Demand in several respects and, given that both Demands were prepared by the same law firm and state similar purposes, Jacob's Demand should be trimmed to mirror Bolouri's. I disagree. Each stockholder has his own right to make a demand on the company in which he holds shares. Thus, the yardstick against which the Court will measure the appropriate scope of inspection is not another stockholder's demand, however similar in purpose, but rather the stockholder's own demand, including the purposes stated and scope of documents requested therein.

Bloom's second blanket scope objection is temporal: Bloom argues Jacob's request to inspect documents dating back to July 1, 2017, is arbitrary since it would require the production of documents that predate the Company's Initial Public Offering on July 24, 2018, and the time Jacob first acquired shares in the Company. The temporal scope of a Section 220 inspection that is based on suspected wrongdoing or mismanagement extends to the time when the evidence reveals the

wrongdoing or mismanagement began.[86]  Here, the record reveals there is a credible

basis to suspect that Bloom's misrepresentations regarding the scope of its salutary

environmental impact date back to 2016.[87]  As for the fuel cells, Bloom's

IPO Prospectus represented that the expected lifespan for its fuel cells "from 2017

onwards," i.e., one year prior to the IPO, would "average over five years between

replacements."[88]  Jacob has presented a credible basis to suspect that representation

was false.[89]  And Jacob has presented evidence to support a credible basis to suspect

the issues surrounding Bloom's misstated financial statements likely predated

---

[86] *See AmerisourceBergen I*, 2020 WL 132752, at *27.  It follows that, contrary to Bloom's contention, a stockholder may inspect records that predate his initial stock purchase in the company that is the target of his inspection demand.  *Id.*

[87] JX 9 at 27 (discussing a lawsuit against Bloom in which it was alleged that the Company was dumping hazardous waste into public landfills).  The Court is mindful that past lawsuits against a company do not necessarily constitute credible evidence of ongoing malfeasance.  *See Louisiana Mun. Police Emps.' Ret. Sys. v. Lennar Corp.*, 2012 WL 4760881, at *3–4 (Del. Ch. Oct. 5, 2012).  As discussed, however, the evidence on record (including independent academic studies and data collected and disclosed by state government entities) provides a credible basis to believe that Bloom's alleged misrepresentations concerning its technology's environmental impact persist.  *See* JX 9 at 31; *Roberts* Compl. ¶¶ 98, 102.

[88] JX 9 at 47 (quoting page 61 of Bloom's IPO Prospectus).

[89] *Id.* at 10–15 (interviewing experts who did not believe the Company's fuel cells could last for Bloom's represented five-year term and sourcing public data tracking Bloom's fuel cells from state government websites, such as California and New York, to corroborate those opinions).

the IPO.[90]  Based on the record, I am satisfied that Jacob's July 1, 2017, start date for production is appropriate.

Bloom's other objections relate to the scope of each individual category of requested documents, which I address in sequence.  Turning to Category 1, Jacob seeks Board Materials relating to, concerning or reflecting, (a) Bloom's accounting practices; (b) the Company's servicing costs and liabilities; (c) any discrepancies between the actual and anticipated servicing costs and liabilities; (d) the Company's "clean" energy claims; (e) the Company's $CO_2$ emissions; (f) the meetings of the Board and any of its committees; (g) any and all inquiries or investigations of the Company by any federal, state, or local government regulators or law enforcement agencies regarding the Company's accounting practices; and (h) any internal investigations by the Company of any employees or officers for accounting irregularities.[91]  The term "Board Materials" is defined to include, but is not limited to, "any memoranda, presentations, reports, correspondence, emails, minutes, recordings, consents, agendas, resolutions, charters, summaries, analyses, transcripts, notes, letters, packages and other similar documents created by,

---

[90] JX 9 at 36–37 (sourcing publicly filed court documents and a 2018 Wall Street Journal article detailing Bloom's role in promoting misstatements concerning its business that resulted in an SEC lawsuit against brokers and a $16.7 million payment by Bloom to those brokers); JX 44.

[91] JX 13.

distributed to or received by or on behalf of the Board or any committees established by the Board."[92]

I agree with Bloom that Category 1's scope is overly broad. As noted, the term Board Materials includes "emails . . . received by or on behalf of the Board or any committees established by the Board." This extends beyond the formal board materials this court typically finds are "sufficient" to satisfy the stockholder's purpose.[93] "The starting point—and often the ending point—for a sufficient inspection will be board level documents evidencing the directors' decisions and deliberations, as well as the materials that the directors received and considered."[94] Jacob cites *Inter-Local Pension Fund GCC/IBT v. Calgon Carbon Corp.* for the proposition that emails are necessary and essential here.[95] But unlike in *Calgon*, where the record revealed the target company did not maintain formal board-level documents reflecting its decision-making, no such evidence was presented here with

---

[92] *Id.*

[93] *See Palantir*, 203 A.3d at 752–53.

[94] *In re Plains All Am. Pipeline, L.P.*, 2017 WL 6016570, at *4 (Del. Ch. Aug. 8, 2017) (quoting *Amalgamated Bank*, 132 A.3d at 790).

[95] *See* Pl.'s Pre-Trial Br. (D.I. 33) at 42 (citing *Inter-Local Pension Fund GCC/IBT v. Calgon Carbon Corp.*, 2019 WL 479082, at *17–18 (Del. Ch. Jan. 25, 2019)).

respect to Bloom's Board.[96] Thus, Jacob failed to carry his burden to prove that emails and other electronic communications among Company fiduciaries are necessary and essential to fulfill his investigative purpose.

I will also limit Category 1 to documents more precisely related to the issues identified in Jacob's Demand, which, by its terms, restricts the investigatory purpose to "*the events, circumstances, and transactions described*."[97] Jacob's Demand identifies as suspected mismanagement or wrongdoing only the servicing liabilities (and related accounting issues) and the misrepresentations of Bloom's green energy affinities.[98] Accordingly, Categories 1(a), (g) and (h) should be limited to the accounting practices flagged by Plaintiffs as prompting their Demand, namely those relating to MSA servicing liabilities. Category 1(f) should be limited to only those meetings of the Board and its committees where the Company's relevant accounting practices or topics pertinent to its "green energy" claims were discussed. With those revisions, I find this category of documents necessary and essential to Jacob's

---

[96] *See Calgon Carbon Corp.*, 2019 WL 479082, at *17; *see also Palantir*, 203 A.3d at 742 (ordering the production of emails only after determining that the target's board did not keep formal records of its activities).

[97] JX 13 (emphasis added). *See Calgon Carbon Corp.*, 2019 WL 479082, at *17 (limiting production category to documents addressing transactions identified in the inspection demand).

[98] JX 13.

investigation of Bloom's accounting and clean energy claims for which it has a credible basis to suspect wrongdoing or mismanagement; they should be produced.[99]

As for Category 2, I am satisfied, with some modifications, that these documents also meet the necessary and essential test. Category 2 requests "Documents reflecting the Company's investigation by any federal, state, or local government regulators or law enforcement agencies for accounting irregularities."[100] The term "Documents" is defined in the Demand to be "used in the broadest sense and include electronically stored information. Th[is] term[] also include[s] accounting-related records such as audited and unaudited financial statements, ledgers, reports, schedules, reconciliations, valuations, pro formas, back up, or work papers."[101]

---

[99] I reject Bloom's argument that Jacob is entitled to inspect only those documents that were both presented to *and* considered by the Board. A document presented to but ignored by the Board that reflects the Company was engaged in improper accounting practices or false disclosures to the market would be relevant to an investigation of fiduciary wrongdoing or mismanagement. *See, e.g.*, *Stone ex rel. AmSouth Bancorp v. Ritter*, 911 A.2d 362, 369 (Del. 2006) (reiterating, in the oversight context, that a fiduciary breach claim can rest on allegations that the fiduciary "intentionally fail[ed] to act in the face of a known duty to act").

[100] JX 13. I note the Demand defines "records" identically to "Documents," but the term "records" is used only to preface the Demand's categories (and never within any individual Category). For the avoidance of doubt, the term "records" should be defined identically to Documents as set out in this decision, and it should not apply to Category 1 (the scope of which is defined above through the Court's definition of "Board Materials").

[101] *Id.*

"This court regularly orders companies to produce communications related to government investigations and litigation in Section 220 cases where those investigations supply or support a credible basis for wrongdoing."[102]   Consistent with the limitations imposed with respect to Category 1, the scope of documents to be produced in response to Category 2 shall relate only to investigations of the servicing liabilities (and related accounting issues) and the misrepresentations of Bloom's green energy affinities.  Likewise, the definition of "Documents" will be limited to formal Board documents (e.g., minutes, resolutions, etc.) and documents submitted to or reviewed by the Board or senior management summarizing what the investigation entailed, any conclusions of investigations, and internal reports and follow-up reports relating to the investigation(s).[103]  These documents are necessary and essential to reveal the degree of Bloom's compliance with positive law and government regulations.

As for Categories 3 and 4, these documents are also necessary and essential, albeit likely duplicative of documents responsive to Category 1.  Category 3 requests

_____

[102] *Pettry*, 2020 WL 6870461, at *26 (ordering that pertinent communications with government regulators and investigatory materials be produced for inspection in addition to board-level materials).

[103] *See Wal-Mart Stores, Inc. v. Indiana Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1273, 1282 (Del. 2014) (affirming order requiring production of officer-level materials); *AmerisourceBergen I*, 2020 WL 132752, at *25 ("In an appropriate case, an inspection may extend further to encompass communications and materials that were only shared among or reviewed by officers and employees.").

Documents reflecting the Company's investigation of any officer or employee for accounting irregularities.[104]   And Category 4 requests Documents reflecting the servicing costs and liabilities that the Company expected to incur.[105]   There appears to be substantial overlap in discernable information between Category 1 and Categories 3 and 4: Board Materials concerning accounting irregularities should encompass investigations into officers and employees, which in all likelihood would be reviewed at the Board level.   And internal documents related to expected servicing costs and liabilities, as submitted to the Board, would likely be captured by Categories 1(b) and (c).   Nevertheless, for the sake of clarity, I confirm that Jacob is entitled to inspect non-privileged documents relating to Company investigations of officers and directors engaged in improper accounting practices relating to servicing costs and liabilities, and internal documents submitted to the Board relating to servicing costs and liabilities.

## III.   CONCLUSION

For the reasons explained above, judgment is entered in favor of Bloom with respect to Bolouri's Demand, and judgment is entered in favor of Jacob with respect to Jacob's Demand.   The parties shall confer regarding scope and conditions for

---

[104] *See Pettry*, 2020 WL 6870461, at \*26–27.

[105] *Id.*

inspection and submit either a joint or competing (with letter explanations) form of implementing order(s) and final judgment(s) within twenty (20) days.